920 A.2d 777 (2007)
392 N.J. Super. 403
Denise M. SCIARROTTA and Peter Sciarrotta, Plaintiffs-Appellants,
v.
GLOBAL SPECTRUM, Comcast Spectator Co., Mercer County Improvement Authority, Mercer County New Jersey, Sovereign Bank Arena, Trenton Titans and/or d/b/a Johnstown Chiefs and Trenton Hockey Club, LLC, and East Coast Hockey League, Inc., d/b/a East Coast Hockey League, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 2007.
Decided April 26, 2007.
*778 Lara Persichetti Lovett, Lawrenceville, argued the cause for appellants (Stark & Stark, attorneys; Ms. Lovett and J. Robert Bratman, of counsel and on the brief).
Scott D. Samansky, argued the cause for respondents (Fishman & Callahan, attorneys; Philip J. Odett, on the brief).
Before Judges KESTIN, GRAVES[*] and LIHOTZ.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
Plaintiffs, Denise M. Sciarrotta and her husband suing per quod, appeal from an order granting defendants' motion for summary judgment and dismissing the complaint with prejudice. In orally articulating his reasons for the decision, the motion judge announced a different basis for dismissing the claims against the various private-entity defendants than applied to the one public-entity defendant specifically considered, the Mercer County Improvement Authority (MCIA). In respect of the latter, the judge ruled under the Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3, that "no evidence has been presented that an employee of the [MCIA] created a dangerous condition to [sic] an act or omission." Although the notice of appeal denotes a challenge to the entire order, plaintiffs have not briefed any arguments regarding the ruling in favor of the MCIA, i.e., the public-entity defendants generally, and must, accordingly, be deemed to have waived that issue. See Pressler, Current N.J. Court Rules, comment 4 on R. 2:6-2 (2006). Our references to "defendants" hereafter are, therefore, to the private-entity defendants.
The claims arose from events on January 4, 2003. Plaintiffs allege that Ms. Sciarrotta was in the Sovereign Bank Arena for a hockey game between defendant teams; that she was sitting in the sixth or seventh row from the ice, above the plexiglass protective barriers; and that there was no protective netting where she was seated. At the time of the incident she was watching the two teams warm up. During warm-ups, according to the deposition of the President and General Manager of defendant Trenton Titans, there are about twenty-five pucks per team on the ice, and the players practice passing the pucks back and forth to each other and taking shots at the goals. The injury occurred when Ms. Sciarrotta was hit in the head by a puck that entered the stands. Another spectator stated that he saw the puck hit the side of the goal post and ricochet into the stands striking Ms. Sciarrotta. Plaintiffs assert that "[t]his hockey game was the first time [Ms. Sciarrotta] had ever sat in general admission seats and her purpose for being at the game was to watch her daughter sing the National Anthem."
Plaintiffs allege, inter alia, that defendants were actionably negligent in failing to "keep the premises in a safe condition"; in "caus[ing] a dangerous condition to exist"; in "fail[ing] to provide proper safeguards and/or warnings on their property"; and in "fail[ing] to provide proper safe . . . access" for patrons.
The motion judge began his analysis with references to the standards governing summary judgment consideration: "that there is no genuine issue as to any material fact challenged and that the moving *779 party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In every instance, "the motion judge [is] to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995). "The `judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)). In reviewing a trial court's summary judgment decision, without according deference to the motion judge's rulings of law, see Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995), we are bound by the same standards, see Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998).
The legal standard that applies to this case was also correctly identified by the motion judge. It is found in Maisonave v. Newark Bears Prof. Baseball Club, 185 N.J. 70, 881 A.2d 700 (2005), where, in respect of spectator safety at sports events, the Supreme Court adopted the limited duty rule as one that
fairly balances the practical and economic interests of owners and operators with the safety and entertainment interests of the fans, . . . to the extent that it holds that owners and operators must offer sufficient protected seating to those who would seek it on an ordinary basis and to provide screening in the most dangerous area of the stands.
[Id. at 81, 881 A.2d 700.]
The Court went on to characterize the scope of the limited duty rule's application in this State:
We expect owners and operators  who are in the best position to determine which areas of the stadium are indeed the most dangerous  to identify those areas and take preventative steps to ensure fan safety to a reasonable extent. * * * [O]wners and operators must reassess whether there is a sufficient amount of protected seating available "in the `most dangerous' locations for those that might reasonably expect to obtain such seats."
[Id. at 82, 881 A.2d 700 (quoting Gil Fried, Baseball Spectators' Assumption of Risk: Is It `Fair' or `Foul'?, 13 Marq. Sports L.J. 39, 58 (2002)).]
The Court established a higher duty, based on "traditional rules of negligence, specifically the business invitee rule, [to] govern owner and operator liability for injuries that occur in all other areas of the stadium." Id. at 87, 881 A.2d 700.
Although the Court in Maisonave dealt with the liability issues in the context of a baseball stadium, it cited, with approval, our decision in Schneider v. American Hockey and Ice Skating Ctr., Inc., 342 N.J.Super. 527, 777 A.2d 380 (App.Div. 2001), where we applied the limited duty rule in the context of a hockey arena, holding:
a hockey rink operator has a limited duty to provide a protected area for spectators who choose not to be exposed to the risk posed by flying pucks and to screen any spectator area that is subject to a high risk of injury from flying pucks.
[Id. at 530, 777 A.2d 380.]
We observed, in surveying cases from other jurisdictions, that "the cases involving claims of persons injured by flying hockey pucks hold that the operator of a hockey *780 rink has the same general duty of care as the operator of a baseball park." Id. at 533, 777 A.2d 380.
Here, in assessing the impact of Maisonave and Schneider, the motion judge aptly recognized that the "Supreme Court [has] stated that what constitutes adequate safety in the stands is a fact-sensitive inquiry, and that the guidelines established in Schneider and Maisonave regarding protective netting behind home plate were not intended to be exhaustive." He held that "by providing protective seating for spectators who might reasonably have requested it[,] . . . the arena has satisfied the first component of the limited duty rule."
The judge rejected plaintiffs' contention "that a genuine issue of material fact exists as to whether or not the section she was seated in contained sufficient protection for watching the warm-ups." According to the motion judge, plaintiffs contended then, as they do on appeal, that during the warm-ups, when there are two teams on the ice, each with many pucks in motion, a greater section of the stadium should be considered dangerous. They also argued that there is a genuine issue of material fact as to whether or not the netting that was in place at the time of the subject accident complied with a July 25, 2002 mandate from the President of the East Coast Hockey League (League) that all teams in the League
must install netting above the glass that borders the corners and the end zones in their rinks. The height and design of the netting configuration may vary due to structural differences from arena to arena, but must be of significant dimension to prevent pucks from entering the spectator areas in the corners and end zones. Member teams will work with their respective arenas, netting manufacture[r]s and suppliers to determine the system best suited to their arena. Installation of the netting systems must be completed as soon as is practicable.
The judge concluded that the expert report presented on plaintiffs' behalf was insufficient to support plaintiffs' contention that defendants had breached a duty owed to plaintiffs, either to provide physical protection from errant pucks during the higher-risk activities of warm-ups, or to warn spectators of the increased dangers.
No factual issue was presented whether any safety netting had been installed; there is no question that netting was in place in the corners and end zones. The critical issues are whether the netting and the customary plexiglass were, together, sufficient protections to satisfy the limited duty owed by defendants to protect patrons from the ordinary risks of the hockey game experience; or whether, in the circumstances, a higher duty was owed. Among the questions to be determined in this case are whether the risks encountered during warm-ups before a game are in the same category as those informing the limited duty described in Maisonave, and whether defendants acted appropriately in the circumstances to discharge the limited duty they owe in respect of the ordinary dangers of the sports event; or whether defendants are bound by the higher duty, based on "traditional rules of negligence, specifically the business invitee rule," Maisonave, supra, 185 N.J. at 87, 881 A.2d 700, that governs owner and operator liability for injuries that occur in contexts outside those normally to be anticipated by spectators in the course of sports events. To the extent warm-ups are an integral part of the hockey game experience, the limited duty rule might be seen to apply. Yet, our inquiry does not end there.
Plaintiffs have provided no basis for viewing the precautions actually taken by defendants to have been inadequate to protect *781 spectators from the risks of injury normally to be anticipated during the course of a hockey game. But, the injury here did not occur during a game; rather, it occurred during warm-ups. The risks are not the same in those two phases of the hockey game experience. As far as we know from the record before us and common knowledge, during a hockey game there is but one puck in play with the players from both teams endeavoring to gain control of that single puck and maneuver it into the opponent's goal. The stream of player action is, generally, in the direction of the goals. The placement of sufficient netting behind the goals and in the corners adjoining them is, as a matter of law, adequate to protect spectators from the occasional errant puck during the game that is so misdirected as to leave the ice and be driven toward the stands. However, the same devices may not provide adequate protection during warm-ups, when many pucks are in motion in varying directions.
Moreover, during the game, with only one puck in play, the spectators are in a position to protect themselves to the same extent as a spectator at a baseball game is in respect of the single ball in play. "While watching the game, either seated or standing in an unprotected viewing area, spectators reasonably may be expected to pay attention and to look out for their own safety." Maisonave v. Newark Bears, 371 N.J.Super. 129, 134, 852 A.2d 233 (App.Div.2004)(quoted with approval on appeal, 185 N.J. at 81, 881 A.2d 700).
Nevertheless, the responsibilities the law places on both owners and spectators may be different in materially different circumstances. We agree with the motion judge that the liability rules of Maisonave and Schneider were not intended to be exhaustive and that the special circumstances of a given case might be seen to portend a result that is different from the general run of cases.
It has been sufficiently established for our present purposes, i.e., to satisfy the summary judgment standard that requires the facts to be viewed indulgently in the non-movant's favor, that warm-ups before a hockey game entail different levels of risk than those occurring during the game itself. As we have already observed, the record discloses that, during warm-ups, the players practice intensely with many pucks on the ice, all moving independently in different directions. It seems obvious that even the most experienced and event-devoted spectators would have difficulty keeping track of all those pucks. We are mindful that a balancing of interests is at the heart of the limited duty concept, a balancing that seeks to "harmonize the interests of fans and owners," Maisonave, supra, 185 N.J. at 83, 881 A.2d 700, by establishing, in a paraphrase of a motivating principle of the Maisonave standard, "a fact-specific standard of care for injuries caused by errant [pucks] at [hockey arenas] by accounting for the open and obvious nature of the risk that [driven pucks] pose to fans." Id., at 78, 881 A.2d 700.
A spectator during the game itself is able to protect herself by paying attention to the location and path of the puck. She allows herself to become distracted at the relatively minor risk of being injured by the single puck in motion. Even so, the standard the law imposes requires the owner to take special steps for protecting spectators in the areas of the arena that present the highest level of spectator vulnerability during games, the end zones and corners. A spectator during warm-ups is not so readily able to provide for her own safety, however, and a greater portion of the stands than just the ends zones and *782 the corners become the areas of vulnerability. "Heightened vulnerability" is the expressed basis in Maisonave for the difference in treatment afforded spectators in the stands of a baseball stadium as distinguished from patrons who leave the stands for other areas of the stadium. See id. at 85, 881 A.2d 700. That difference in treatment reflects the possibility of a changing status relationship between the owner and the patron based upon the nature of the activity and the reasonable expectations of the spectator.
Here, there are questions of fact to be determined. We pose the most obvious ones. Did defendants take appropriate steps to protect spectators from, or warn them about, the special dangers inherent in warm-up activities? Did the owners and operators of the teams reasonably conform to League requirements in the protective steps they took? To what extent are the injuries incurred attributable to the injured plaintiff's own inattention or disregard for her own safety?
No rule of strict liability governs, see ibid.; rather, "traditional tort principles", ibid., as adjusted by the limited duty rule, id. at 81-82, 881 A.2d 700, apply to assign to the finder of fact the responsibility of determining whether the owner has taken reasonable care, in the circumstances, with due regard being given to the choices made by the injured spectator at the time, to guard appropriately against inherent dangers. It may well be that defendants will be found to have taken every reasonable precaution to protect their patrons against the risk of injury from any activities associated with a hockey game; or the finder of fact may be persuaded that other steps could reasonably have been taken to minimize the risk of injury during warm-ups or to provide more effective warnings of the risks inherent in that particular activity. We conclude, on this basis, that defendants' motion for summary judgment should not have been granted, and that plaintiffs are entitled to the opportunity to develop their proofs, expert and otherwise, within the bounds of Maisonave, that more adequately protective steps were available and should have been taken to minimize the risk of harm from the specific activity at issue.
Affirmed in part, as to the public-entity defendants; reversed and remanded as to the private-entity defendants.
NOTES
[*] Judge Graves did not participate in oral argument. He joins the opinion with the consent of counsel.